**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **HILARY CRUMB,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **A-11-CA-219  LY** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

The Magistrate Court submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.  Before the Court are Plaintiff's Opening Brief, filed September 19, 2011 (Clerk's Dkt. #16); Brief in Support of the Commissioner's Decision, filed November 16, 2011 (Clerk's Dkt. #17); Plaintiff's Reply Brief, filed December 5, 2011 (Clerk's Dkt. #20) and the Social Security Record filed in this case ("Tr.").

**I.  PROCEDURAL HISTORY**

Plaintiff Hilary Crumb ("Crumb") applied for social security benefits on December 28, 2006 alleging disability beginning March 30, 2005, due to a back injury and other health issues.  (Tr. 115, 134).  His claim was denied at the administrative level.  (Tr. 56-57).  Crumb then filed a request for

a hearing which was conducted before an Administrative Law Judge ("ALJ") on April 10, 2009.  (Tr. 22, 66).

The ALJ issued her decision on August 27, 2009.  In her decision, the ALJ found that Crumb suffered from the severe impairments of chronic low back pain, chronic dizziness, affective disorder and lumbar radiculopathy, but concluded that Crumb retained the residual functional capacity to perform a somewhat limited range of light work.  (Tr. 13-20).  Plaintiff appealed.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 31, 2011.  (Tr. 1-3). Plaintiff filed this action seeking judicial review of the ALJ's decision on March 21, 2011.

Plaintiff appeals from the determination of the Administrative Law Judge ("ALJ") that he is not "disabled" and presents for review the following issues: (1) whether the ALJ erred in failing to mention the opinion evidence from Brian Karvelas; (2) whether the ALJ erred in relying on the consultative report of Mihnea Dumitrescu; (3) whether the ALJ erred in labeling the opinion of Stephen Blair as "dire"; (4) whether the ALJ's mental residual functional capacity assessment is supported by substantial evidence; (5) whether the hypothetical posed by the ALJ to the vocational expert accurately reflected Crumb's limitations; (6) whether the ALJ's credibility determination is supported by substantial evidence; and (7) whether the ALJ misstated the issue regarding "total disability.".

## II.  FACTUAL BACKGROUND

Crumb was born on May 13, 1959.  (Tr. 115).  He completed the fifth grade.  (Tr. 29). Plaintiff has past work experience as a coin packager, airline cargo warehouse worker and forklift operator.  (Tr. 133-35).

Records from Sequoia Hospital Rehabilitation Services dated April 17, 2005, note that Plaintiff reported he felt a twinge in his low back while pushing a container on March 30, 3005.  The pain intensified that evening and Crumb was off work thereafter.  He was reporting constant back pain.  A physical therapy plan was outlined.  (Tr. 274-75).  A May 31, 2005 physical therapy discharge summary noted Crumb was discharged because he had reached maximum potential/plateau.  The summary also noted "the patient made limited progress in the course of physical therapy."  (Tr. 280).

A physical examination was performed by Brian Karvelas, M.D. ("Karvelas") on November 8, 2005.  Karvelas described Crumb as alert, cooperative and in no acute distress, with normal station and gait.  Karvelas reported a June 13, 2005 MRI revealed a left disc extrusion at the L2-3 level and an annular tear at the L4-5 level with a left paracentral disc bulge.  Karvelas also stated Crumb had reported some change in his symptoms following a July 1, 2005 epidural injection.  Karvelas described Crumb's current symptoms as including persistent intermittent flaring lower back pain at the base of the spine extending upwards to the mid back and rarely up to the neck, and occasional pain radiating down the posterior left thigh to the back of the knee associated with weakness.  Further, the symptoms in general were worse with prolonged sitting, bending and reaching activities and heavy lifting (greater than 20 pounds), but were somewhat relieved by walking.  Crumb was also reporting significant side effects on his current analgesic medication (tramadol) including drowsiness, dizziness and sleeplessness.  (Tr. 357-58).

On physical examination, Karvelas reported Crumb had a reduced lumbar range of motion, associated with lower back pain symptoms, positive straight leg raise on the left greater than the right, and tenderness to palpation over the lumbar spine diffusely prominent at the L5 level.  His

diagnostic impression was two-level lumbar disc disease, symptomatic.  Karvelas requested additional physical therapy and noted current work restrictions included preclusion from heavy lifting (greater than 20 pounds), repeated bending, stooping or reaching, and prolonged sitting.  (Tr. 356-61).

On May 8, 2006, Crumb received lumbar epidural steroid injections.  Physical examination notes of Crumb dated that same date report positive tender midline at L4-5 and positive bilateral straight leg raise test.  The preoperative and  postoperative diagnosis was low back pain secondary to degenerative disk disease and disk herniations at the L2-3 and L4-5 levels.  (Tr. 258-61).

From February 2006 through February 2007, Crumb visited Kaiser Permanente for uncontrolled hypertension, lightheadedness, dizziness and headaches.  (Tr. 302-18).

A progress report from Karvelas dated August 1, 2006, reported Crumb was still complaining of persistent flaring pain at the midline of his lower back .  Karvelas noted restricted lumbar motion and paraspinal tenderness.  He continued Crumb's current work restrictions, including no lifting greater than twenty pounds, repetitive bending or stooping, prolonged sitting, driving greater than thirty minutes at a time or greater than two hours total per day, and operating foot pedals repetitively. (Tr. 342-43).

On August 15, 2006, Crumb again received lumbar epidural steroid injections.  Physical examination notes of Crumb dated that same date report tenderness at the midline L4-5, left L4-5 and L5-S1 facets and right L5-S1 facets, and positive bilateral straight leg raise.  The preoperative and  postoperative diagnosis was low back pain secondary to diskogenic, and likely lumbar facet mediated etiologies.  (Tr. 252-57).

On September 8, 2006, Karvelas examined Crumb and prepared a Permanent and Stationary Narrative Summary. Karvelas reviewed Crumb's treatment to date. He described Crumb's current symptoms as including persistent pain in the middle of the lower back radiating halfway up the spine and down to the mid posterior left thigh, worse with prolonged sitting, prolonged and repetitive bending at the waist, reaching and lifting greater than twenty pounds. Karvelas also noted Crumb's symptoms were occasionally alleviated with walking or light stretching. (Tr. 334-36).

Karvelas described Crumb as in no acute distress, with normal station and gait. On physical examination of Crumb, Karvelas noted abnormal lumbar range of motion: reduced flexion and extension, and reduced lateral bending. Citing objective factors of loss of motion, tenderness, spasm and MRI results, and subjective factors if frequent slight pain becoming moderate on an occasional basis, Karvelas opined that Crumb had a disability involving his lumbar spine which is equivalent to a disability precluding heavy lifting and repeated bending and stooping. Karvelas concluded the result was a total whole person impairment of ten percent. (Tr. 337-41).

In a January 24, 2007, disability report Crumb stated his height was 6 feet and his weight was 225 pounds. (Tr. 133). He reported his illnesses as back injury and other health issues. Crumb stated in the report that he can lift nothing over twenty pounds, cannot sit and stand for long periods of time, cannot concentrate or function, and always feels dizzy. (Tr. 134). The interviewer commented Crumb seemed to have trouble concentrating, noting each time he was asked a question, Crumb hesitated and thought for a while. (Tr. 131).

Crumb's wife completed a third party function report on February 10, 2007. She reported Crumb walked for thirty minutes in the morning, and depending on how he felt, went to the store and did his laundry. She noted Crumb's personal care took him longer due to pain, but he was able to

prepare simple meals daily, do his laundry, take out small trash bags, walk and go to the store daily, drive, shop and handle money.  She also noted she sometimes needed to remind him to do his laundry or take out the trash.  (Tr. 165-70).

The reported findings of an April 22, 2007 MRI were two-fold.  First, at the L2-3 level, moderate diffuse disc bulge was noted with anterior indentation of the thecal sac.  Second, at the L4-5 level, moderate diffuse disc bulge was noted with anterior indentation of the thecal sac and possible bilateral lateral recess impingement related to the disc enlargement and the bilateral ligamentum flavum hypertrophy at this level.  The impression was degenerative disc disease.  (Tr. 430).

On June 8, 2007, Crumb underwent a comprehensive psychiatric consultative examination by Antoinette Acenas, M.D. ("Acenas").  Acenas notes Crumb stated he was capable of performing his personal grooming and hygiene and that he did all the household chores of cooking, cleaning, and doing the laundry..  Acenas described Crumb as coherent, presenting a cohesive history, with no delusions, hallucinations or suicidal thoughts.  Plaintiff's current global assessment of functioning ("GAF")[1] was assessed at 70.  Acenas found Crumb was capable of managing his own funds, able to perform simple and repetitive tasks, as well as accept instructions from supervisors, and, not considering physical factors, able to perform work activities on a consistent basis, maintain regular attendance, and finish a normal work week. (Tr. 368-70).

---

[1]GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994)(DSM-IV).

Crumb was seen by Dr. Leena Khanzode ("Khanzode") on August 17, 2007, for an initial visit concerning his complaints of anxiety and depression. Khanzode noted Crumb was complaining of depression including depressed mood, anhedonia, significant appetite change, insomnia, decreased energy, decreased concentration and decreased libido, panic including shortness of breath, fear of going crazy, fear of dying, palpitations, dizziness, lightheadedness, shaking, chest pain, sweating and nausea, hearing voices and not trusting anyone, as well as easy distractability. The mental status examination noted Crumb to have normal behavior, depressed mood, logical thought process, hallucinations, with normal attention, concentration and an intact recent memory with good impulse control. The diagnosis was depression and anxiety, with a GAF of 55-60. Celexa and outpatient treatment were prescribed. (Tr. 602-10).

A follow-up visit in October 2007, notes Crumb was doing better, although he continued to be depressed, he was crying less and enjoying going to movies and walking, but still had low energy, poor concentration, and continued to hear voices. His mental status was noted as normal with the exception of a depressed mood, blunted affect and hallucinations. The diagnosis was chronic major depression, recurrent and severe with psychosis, with a GAF of 51-60. Additional medication was prescribed. (Tr. 596-99).

January 24, 2008, psychiatric progress notes indicate Crumb was sleeping better, no longer hearing voices, but complaining of easy distractability. His mental status was noted as normal and his GAF was rated as 51-06. The assessment described Crumb as hypomanic and easily distracted. His medication was changed and his diagnosis was noted as bipolar disorder. (Tr. 591-92).

March 3, 2008, psychiatric progress notes state Crumb was reporting doing better, but also reported he was not taking his medication and had never taken it as prescribed. His mental status

was noted as normal except for halting speech, an anxious mood, blunted affect, disorganized thought process, auditory hallucinations, marginal insight and marginal judgment. His GAF was 51-60 and the diagnosis was chronic schizoaffective disorder. (Tr. 588-90).

April 17, 2008, psychiatric progress notes indicate Crumb was doing better, was able to sleep and not as impulsive, still easily distracted, but did not want any more meds. His mental status was normal but for rapid speech, anxious mood, and mood congruent affect. Although Crumb's med compliance was noted as poor, he was continued on his current medication. The diagnosis was chronic schizoaffective disorder, with his GAF rated as 51-60. (Tr. 585-87).

In a hospital progress note dated May 19, 2008, Crumb was complaining of low back pain, rated as five on a scale of one to ten. He was reporting walking thirty minutes per day, but doing exercises only every other day due to pain. Crumb's gait was noted as fine, with fair balance and an almost full squat. The assessment was chronic low back pain with lumbar radiculopathy and degenerative disc disease. Crumb was reported to exhibit less pain behavior on that day, but was still self restricting on movement testing. (Tr. 552-54).

Psychiatric progress notes dated May 29, 2008, indicate Crumb was again reporting difficulty concentrating, and being easily distracted, but reiterated he did not want any more meds. The diagnosis was schizoaffective disorder, with a GAF of 51-60 with moderate symptoms. (Tr. 582-84). In notes dated the following day, Crumb was reporting a history of low back pain. He described his pain as constant, with intermittent radiation into his lower extremity. The note states Crumb did not report significant impairment in his ability to perform activities of daily living, but says that prolonged sitting exacerbates the pain, but that walking and ice help. (Tr. 550-51).

On June 7, 2008, Acenas performed anither comprehensive psychiatric evaluation of Crumb. Crumb reported a history of anxiety and depression which had worsened with his inability to work following his 2005 back injury. His medications were noted as Nortriptyline, Zyprexa, Hydrocodone and Amlodipine. Crumb stated he was capable of performing his personal grooming and hygiene, and is able to help out his wife with household chores, cooking, cleaning and doing the laundry. Crumb was noted as not in any form of physical distress, coherent and without delusions or hallucinations. He was oriented and able to do serial threes, but could not spell "world" forward or backward. Acenas assessed Crumb's GAF as 70. She further found him able to manage his own funds, perform simple and repetitive tasks, accept instructions from supervisors, interact with coworkers, and able to perform work activities on a consistent basis. (Tr. 446-49).

Progress notes dated June 25, 2008, state Crumb was reporting chronic severe low back pain with some radiation to both upper legs. His status was noted as unchanged. (Tr. 548-50).

New patient notes dated October 20, 2008, report Crumb presented complaining of persistent low back pain radiating down both legs, hypertension, dizziness and nausea which had become chronic. Current medication for back pain and hypertension were continued, and new medication was prescribed for nausea. (Tr. 567-69).

New patient notes from Stephen Blair, M.D. ("Blair") dated February 18, 2009, reflect Crumb was complaining of chronic low back pain. He was noted as describing his pain as moderate, although essentially constant. Crumb reported he got some pain relief with rest and narcotic pain medication. In reviewing Crumb's hypertension, Blair noted Crumb was able to maintain his diet and exercise regiment. Blair referred Crumb to pain specialist Dr. Dumitrescu ("Dumitrescu"). (Tr. 576-77).

An MRI of Crumb's lumbar spine was taken on February 20, 2009.  The impressions were two-fold.  First, left paracentral protrusion of degenerated disk material at the L4-L5 level, with potential for displacement of the crossing left L5 nerve.  Second, minor annular bulging at the L2-L3 level, with no nerve root involvement.  (Tr. 572-73).

Mihnea Dumitrescu, M.D., of Precision Pain Consultants, performed a clinical assessment of Crumb on March 12, 2009.  Dumitrescu noted axial lumbosacral pain and somatic referred buttock and leg pain bilaterally, which pain could be dlscogenic or facetogenlc. Dumitrescu further noted Crumb had facet joint arthrosis, right greater than left at L5/Sl, and mild to moderate at L4/5, with a posterior anular fissure at L4/5 and also a small posterior anular fissure at L2/3 levels. Dumitrescu advised against bed rest, encouraged Crumb to resume normal activities, and initiate an appropriate exercise program.  (Tr. 613-15).

By letter dated May 1, 2009, Blair stated he had reviewed Crumb's records from Karvelas, Crumb's MRIs and the report of Dumitrescu.  Based on those records, Blair opined that Crumb should sit no longer than three to four hour in an eight-hour workday and stand no more than four hours total in an eight-hour workday.  (Tr. 618).

Plaintiff's administrative hearing was held on April 10, 2009.  (Tr. 22).  At the hearing, Crumb testified he had completed the fifth grade and had only a limited ability to read and write. He stated he had briefly returned to work after a March 30, 2005, injury and was given lighter duty, but was unable to perform the amount of bending required and was laid off in June 2005.  Crumb further stated he had a driver's license, had driven himself to the hearing, and drove almost every day.  He reported he was able to walk at least thirty minutes a day. (Tr. 28-31, 34-35).

When asked about his inability to work, Plaintiff stated his pain varied, sometimes bothering him when he stood for a long time, and sometimes when he sat for a period. (Tr. 31). Psychiatric records reviewed during the hearing from May 2008, reflected a diagnosis of bipolar disorder. Plaintiff stated he stopped taking the Lithium prescribed because he was taking too much medication. (Tr. 36-37).

Plaintiff described his pain as a burning, stinging sensation, going down both of his legs, and sometimes "halfway from [his] spine and muscle spasms." (Tr. 39). Crumb testified he took Hydrocodone twice a day, which helped, although it did not make the pain go away completely. He also said the medication sometimes made him dizzy or nervous or drowsy. (Tr. 39-40).

Plaintiff also testified he had experienced psychiatric problems since he had hurt his back. He referenced both a nervous breakdown and a diagnosis of bipolar. Crumb also described himself as depressed, sad and ready to cry. He testified he did not believe he could work around people because he just can't take dealing with people. (Tr. 41-44). .

Vocational expert Molly Malloy ("Malloy") also testified at the administrative hearing. (Tr. 44). The vocational expert reviewed Plaintiff's past work history, classifying Crumb's prior work as a coin counter, wrapper, packer as medium semi-skilled, his work as a material handler as heavy semi-skilled, and his work in warehouse and cargo as medium semi-skilled. (Tr. 46). The ALJ posed a hypothetical claimant to Malloy who is Crumb's age, with a marginal educational background, who can do light work, with the additional limit that he would have an opportunity to alternate sit/stand at will every thirty minutes throughout the day, who is limited to only occasional postural movements, who should not be around unprotected heights or moving hazardous machinery, who is limited to simple, routine, repetitive tasks, who should have a job dealing with things rather

11

than people, and should only occasionally work in a field that would involve interaction with crowds, public, and co-workers.  Malloy testified such an individual would be unable to perform any of Plaintiff's past relevant jobs.  (Tr. 46-47).

Malloy further testified such an individual, with a modification to the sit/stand option at every sixty minutes, would be able to perform jobs including garment folder, microfilm mounter or restroom attendant.  (Tr. 47-50).  As to the microfilm mounter job, she testified that if such an individual turned in work from 80-89% correct every day the employer would have to determine whether that was a problem.  (Tr. 50-54).

### III.  LEGAL STANDARDS

Judicial review in social security cases is limited by statute.  *See* 42 U.S.C. § 405(g); *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).  The district court reviews the record to determine whether the Commissioner's decision is legally correct and supported by substantial evidence.  *See Austin v. Shalala*, 994 F.2d 1170, 1174 (5th Cir. 1993); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Substantial evidence is defined as "relevant evidence that a reasonable mind might accept to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).  It is more than a scintilla, but less than a preponderance.  *See Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427.  The district court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  However, the court must scrutinize the entire record to ascertain whether substantial evidence supports the Commissioner's findings.  *See Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988).

A disabled worker is entitled to monthly benefits under the Social Security Act if certain conditions are met.  42 U.S.C. § 423(a).  The Act defines "disability" as the inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or last for a continued period of twelve months. *Id.* § 423(d)(1)(A); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).

The Commissioner has promulgated a five-step sequential process to be used by hearing officers in disability cases:

1.  The hearing officer must first ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the medical findings.

2.  The hearing officer must then determine whether the claimed impairment is "severe." A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities. This determination must be made solely on the basis of the medical evidence.

3.  The hearing officer must then determine if the impairment equals or exceeds in severity certain impairments described in Appendix 1 of the regulations. This determination is made using only medical evidence.

4.  If the claimant has a "severe impairment" covered by the regulations, the hearing officer must determine whether the claimant can perform his past work despite any limitations.

5.  If the claimant does not have the residual functional capacity to perform past work, the hearing officer must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and residual functional capacity.

*See generally*, 20 C.F.R. § 404.1520(b)-(f). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987). The burden then shifts to the Commissioner to show the claimant is capable of performing work in the national economy. *Id*. A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

13

"Residual functional capacity" refers to the claimant's ability to do work despite any physical or mental impairments.  20 C.F.R. § 404.1545(a).  The ALJ is responsible for assessing and determining residual functional capacity at the administrative hearing level.  *Id*. § 404.1546.  This assessment is based on reports from treating physicians and medical consultants about the claimant's ability to sit, stand, walk, lift, carry, and perform other work-related activities.  *Id*. §§ 404.1513(b)(6) & 414.1513(c)(1).  The opinions of treating physicians are generally entitled to great weight.  *Id*. § 404.1527(d)(2); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  However, a treating doctor's opinion on the nature and severity of an impairment is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record."  20 C.F.R. § 404.1527(d)(2); *Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993).

### IV.  ADMINISTRATIVE DECISION

In determining Crumb was not entitled to benefits, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 30, 2005.  At step two of the five step analysis, the ALJ found Crumb has the severe impairments of chronic low back pain, chronic dizziness, affective disorder and lumbar radiculopathy.  (Tr. 13).  The ALJ next found Plaintiff's impairments did not meet or equal one of the listed impairments.  She found Crumb's mental disorders to cause him mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  (Tr. 14).

The ALJ then concluded Crumb retains the residual functional capacity to maintain employment at the following level:

the claimant has the residual functional capacity to perform light work, with the following additional limits.  He must have jobs that permit him to alternate positions between sitting and standing at will every 60 minutes throughout the day; he can occasionally climb, balance, stoop, kneel, crouch and crawl; he should avoid exposure to unprotected heights and moving/hazardous machinery.  Mentally, he is limited to simple, routine, repetitive tasks; should deal with things rather than people; and he should only have occasional interaction with crowds/public/coworkers.

(Tr. 15).  In finding Crumb did not retain the ability to perform the full range of light work, but there are jobs that exist in significant numbers in the national economy that he can perform, the ALJ relied on the testimony of the vocational expert:

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Rule 202.18.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

The vocational expert testified that given all of these factors the individual would be able to perform the requirements of the following representative occupations (all of which are classified as light, unskilled work): (1) garment folder, with 1380 jobs in Texas and 36,000 jobs in the US; (2) microfilm mounter, with 975 jobs in Texas and 42,500 jobs in the US; and (3) restroom attendant, with 1,143 jobs in Texas and 66,280 in the US.

(Tr. 20-21).

## V.  ANALYSIS

Crumb first complains the ALJ erred in failing to mention the opinion evidence from his treating physician Karvelas.  Specifically, Crumb points to Karvelas' opinion that he was restricted from repeated bending and stooping, lifting more than twenty pounds, and prolonged sitting.  He maintains Karvelas' opinion should have been addressed by the ALJ because Karvelas was the only physician with a longitudinal relationship with him, entitling Karvelas' opinion to additional weight.

15

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir. 1994).  It is the responsibility of the ALJ to resolve questions of credibility and questions arising from conflicting medical opinions.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  Thus, the ALJ may discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise unsupported by the evidence.  *Newton v. Apfel,* 209 F.3d 448, 456 (5th Cir. 2000).  *See also* 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have"); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (rejecting "isolated, conclusory statement" of treating physician when considered in conjunction with other opinions, objective medical evidence, and claimant's own testimony).

As the Commissioner points out, the ALJ states in her opinion that she considered the evidence of record, specifically including the portions of the record containing Karvelas' opinions. Crumb nonetheless insists the ALJ's failure to expressly address Karvelas' opinion was erroneous. In support, however, he simply cites cases which hold the opinion of a treating physician is generally entitled to greater weight than that of other experts.  In this case, as noted above, Karvelas opined that Crumb was restricted to lifting no greater than twenty pounds, no repeated bending or stooping, and no prolonged sitting.  The ALJ's conclusion that Crumb was able to perform a limited range of light work, with additional limitations on prolonged sitting and standing is well in line with

16

Karvelas' opinion as to Crumb's lifting restrictions.  *See* 20 C.F.R. § 404.1567(b) (defining light work as lifting no more than twenty pounds).

Crumb complains Karvelas' opinion is not fully incorporated, however, because the doctor opined Crumb was restricted from prolonged sitting.  In support, he cites a Social Security Ruling which states:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work.

(SSR 83-12, 1983 WL 31253, at *4).   This argument is also unavailing,  As noted above, the ALJ did not conclude Crumb could do a full range of light work.  Rather, the ALJ specifically included a requirement of change in position every sixty minutes.  The undersigned thus finds Crumb has failed to establish error in the ALJ's failure to specifically reference Karvelas' opinion.[2]

Crumb next argued the ALJ erred in relying on the consultative report of Mihnea Dumitrescu. In pertinent part in her opinion, the ALJ stated:

> The ALI finds much more persuasive the examination by pain specialist Mihnea Dumitrescu, M.D., of Precision Pain Consultants, who examined the claimant on March 12, 2009. Dr. Dumitrescu reported that the claimant was evaluated for lower back and leg pain. On physical examination his blood pressure was 133/86. He

---

[2]Plaintiff also suggests the ALJ erred because the vocational expert testified Crumb would be unable to perform any occupation because of the stated need for an alternate sit/stand option. (Plf. Reply at 6).  The vocational expert did testify a requirement to alternate sitting and standing every thirty minutes could not be accommodated.  However, when the ALJ altered the hypothetical posed to her, the vocational expert testified there were jobs which could accommodate a requirement to alternate sitting and standing every sixty minutes.  This less stringent requirement was incorporated in the ALJ's decision, thus Crumb has not identified any error on this basis.

weighed 210 pounds and was 6 feet tall. The diagnosis was axial lumbosacral pain and somatic referred buttock and leg pain bilaterally. Dr. [Dumitrescu] noted the claimant's pain could be discogenic or facetogenic. He reported that the claimant had facet joint arthrosis, right greater than left at L5/SI and mild to moderate at L4/5. He also had a posterior annular fissure at L4/5 and also a small posterior annular fissure at L2/3 levels. In fact, far from finding claimant disabled, Dr. [Dumitrescu] reported that the claimant was encouraged to resume normal activities and initiate an appropriate exercise program.

(Tr. 17). According to Crumb, Dumitrescu's reference to his ability to "resume normal activities" is not a sufficient basis for the ALJ to conclude he is able to perform light work.

Crumb's argument overstates the importance of the ALJ's inclusion of Dumitrescu's reference in her opinion. In her opinion the ALJ also discusses medical evidence which confirms Crumb's complaints of persistent low back pain and diagnoses of degenerative disk disease, but also that Crumb reported his pain as two or three, or between three and five on a scale of one to ten, that his flexion was impaired but extension, lateral bending and gait were normal, and his pain was improved with walking. (Tr. 15-17). In sum, the ALJ stated

The record indicates that the claimant has been seen on numerous occasions with complaints of low back pain. However, as noted below, he is not a surgical candidate; his treatment has been conservative, and his neurological exams have been basically normal. As discussed further below, no objective medical evidence regarding his back problems supports a conclusion that claimant is physically limited to working at less than a light exertional level.

(Tr. 16). Crumb has not shown the ALJ solely relied on the opinion of Dumitrescu, and thus his claim of error on this basis fails..

Crumb further complains the ALJ erred in dismissing the opinion of Blair as "dire" and unsupported. As set forth above, in a May 2009 letter, Blair opined Crumb should sit no longer than three to four hours in an eight-hour workday and stand no more than four hours total in an eight-hour workday. (Tr. 618). In her opinion, in pertinent part, the ALJ stated

> Dr. Stephen Blair, a family doctor, examined claimant on one occasion on February 18, 2009 due to chronic low back pain, hypertension and hyperlipidemia. He reported having extensively reviewed many of claimant's past treatment records, and as described further below, he concluded that claimant would not be able to work even at a sedentary level due to his chronic pain. The ALJ assigns very little weight to this conclusion, as Dr. Blair only functioned as an examining doctor; orthopedic treating doctors (i.e., treating specialists) who treated claimant extensively concluded he can work and is not disabled by back pain; and nothing in the objective medical evidence supports Dr. Blair's *dire* conclusions.

(Tr. 17) (emphasis in original).  According to Crumb, the ALJ's dismissal of Blair's opinion was erroneous because Blair expressly stated he was relying on the opinions of Karvelas and Dumitrescu, and the objective findings in MRIs.

The undersigned finds no error in the ALJ's use of the word "dire" or her suggestion that Blair's opinion is unsupported.  The ALJ clearly noted Blair had reviewed Crumb's records.  The ALJ also explained why she was assigning little weight to Blair's opinion.  In so doing, she specifically found Blair's opinion to be contrary to the sources on which Blair purportedly relied.  The ALJ is entitled to weigh the opinions of the examining physicians and medical experts and determine the credibility of each.  *Gardner v. Barnhart*, 160 Fed. Appx. 428, 430 (5th Cir. 2005); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  As Blair's opinion was significantly more "dire" than the opinions of others who had treated Crumb, the ALJ's use of the word was simply descriptive.  Crumb has failed to establish any error in the ALJ on this basis.

Crumb next maintains the ALJ's mental residual functional capacity assessment is not supported by substantial evidence.  In pertinent part, the ALJ stated:

> In activities of daily living, the claimant has mild restriction. He reported to the consultative examiner that he was capable of performing his personal grooming and hygiene. He reported that he helped out his wife with household chores, cooking, cleaning and doing the laundry. In social functioning, the claimant has mild difficulties. He reported that he did not socialize and at times isolates himself.

19

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. During the consultative evaluation he was not able to spell the word world correctly forwards or backwards. Primarily, this determination is made because claimant has significant memory issues caused by his medications. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

(Tr. 14) (citation omitted).  According to Crumb, the ALJ's opinion is erroneous as he is unable to maintain the pace, persistence and concentration required of even simple, repetitive tasks.  In support, Crumb cites to progress notes from psychiatric treatment he received from August 2007 through May 2008.  As set forth above, these notes indicate he often reported feeling easily distracted and had difficulty concentrating.  Crumb also cites the intake interviewer's comment that he had trouble concentrating

The ALJ did find Crumb had moderate difficulties maintaining concentration, persistence or pace.  She also concluded Crumb was mentally limited to simple, routine repetitive task.  In making her conclusion, the ALJ clearly considered the evidence of psychiatric treatment, stating:

> The record also reflects that the claimant has received treatment for depression. As described further below, the weight of the medical evidence in this realm does not support a conclusion that claimant's mental problems preclude him from work. The claimant reported that he had anxiety and depression on and off for several years that were mild enough for him to cope with until 2005 when he began experiencing back pain. He reported that not being able to work since the injury aggravated his depression as his back pain. He reported that he saw a psychiatrist who prescribed Zyprexa for his complaint of hearing voices.

> Dr. Leena Khanzode reported that the claimant was seen on August 24, 2007 in a referral from his therapist for evaluation and treatment. The claimant reported having anxiety and depression for many years but never being treated. He reported that his symptoms worsened in the last year. His mental status examination revealed that his mood was depressed and his affect was blunted. His thought process was logical. He reported having hallucinations. He was fully oriented. His attention and concentration were normal. His recent memory was intact. His fund of knowledge was normal. His impulse control, insight and judgment were good. Dr. Khanzode reported that the claimant had problems with relationships and occupational problems. He was

20

diagnosed with general anxiety disorder, major depressive disorder with psychotic features. She assigned him a GAF of 51-60 and reported that his symptoms were moderate. The claimant was seen for a medication follow-up regarding his depression and anxiety disorder on March 3, 3008. Dr. Khanzode reported that the claimant reported that he had been doing better. He reported that he was able to sleep and his energy was ok. However, he informed Dr. Khanzode that he had not been taking the Lithium and Risperdal. He reported that he was too sensitive to the medication as it seemed very potent. He informed Dr. Khanzode that he never took the meds as they were prescribed. He reported that he took 1-2 pills of Lithium as needed. He reported that he had been hearing voices on and off and he stayed away from everybody. Dr. Khanzode noted that the claimant was unable to describe his symptoms. Dr. Khanzode assigned the claimant a GAF of 51-60 with moderate symptoms. She reported that he had been noncompliant. His Lithium level was very low. She reported that he was still psychotic but was not taking Risperdal as prescribed. He was educated about his illness and medication compliance.

When seen in follow-up evaluation on May 29, 2008, the claimant reported that he had been doing pretty much the same. He stated that he had been surviving, but did not want any more meds. He reported that he had difficulty with concentration and had been feeling a little down. He denied feeling hopeless. He reported that his energy was okay. Dr. Khanzode reported that the claimant had been doing better. He was able to sleep. His energy was ok. He was not as impulsive but continued to be easily distracted, starting several projects. The claimant did not view this as a problem. He reported that he was just like his mother. He stated that he had always been like this. He reported that he had not been hearing voices. He stated that he did not want to increase his meds. He informed Dr. Khanzode that he would be moving to Texas the following November as his wife had been transferred there. In her assessment Dr. Khanzode reported that the claimant had been on Zyprexa and had been mildly depressed with no psychotic symptoms. He was advised to continue his medication as he did not want to increase the dose.

On June 7, 2008, the claimant underwent a psychiatric consultative evaluation at the request of the Administration done by Dr. Antoinette Acenas. The claimant complained of anxiety and depression. Dr. Acenas reported that the claimant's mood was depressed with appropriate affect. He was oriented times 3. Regarding memory, she reported that he was not able to remember any of the three objects in three minutes. He was able to do serial 3s. Overall, Dr. Acenas found claimant is capable of performing basic math computations and low level reading. Regarding the claimant's diagnosis Dr. Acenas reported that claimant's physical condition was causing psychological symptoms. She assigned the claimant a GAF of 70. Dr. Acenas reported that the claimant was capable of managing his funds. . . .

21

In summary, the claimant's allegations of disability are not supported by the evidence of record. As previously noted the claimant admitted during the "Psychological Evaluation" that he was able to perform his personal grooming/hygiene. He helps out his wife with household chores, cooking, cleaning and doing laundry. He was coherent during the evaluation and resented a cohesive history of his illness. The consultative examiner reported that he had basic mathematical skills. She also reported that the claimant had the ability to perform simple and repetitive tasks and also was able to accept instructions from supervisors as well as interact with coworkers. . . .

While the claimant has received treatment for his allegedly disabling condition, that treatment has been essentially routine and/or conservative in nature. There is also evidence that the claimant has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application. The medical evidence indicates that the claimant's condition has been controlled and effectively managed with his current treatment.. . .

The state agency consultants concluded that, despite his "severe' impairments the claimant retained the ability to perform the mental and physical requirements of basic work-related activities. These physicians are not examining physicians, and as a general matter their opinions do no merit as much weight as those of examining or treating physicians.. . . Regarding the claimant's mental limitations the state agency medical consultants determined that his limitations were non-severe. The undersigned finds claimant has significant memory issues, likely related to side effects from his medications, and has, therefore, assessed mental limitations in his RFC based on the record and claimant's testimony.

(Tr. 18-20) (citations omitted).

In sum, the judge reviewed all of the evidence of record, and concluded the evidence supported limitations on Crumb's ability to perform light work, but did not wholly prevent him from engaging in such work. The undersigned finds no error in this analysis. *See Wilson v. Barnhart*, 210 F. App'x 448, 451 (5th Cir. 2006) (ALJ properly evaluated credibility by considering claimant's symptoms and claimed limitations, and analyzing findings in light of allegations and medical evidence); *Wilson v. Barnhart*, 129 F. App'x 912, 915 (5th Cir. 2005) (ALJ supported credibility assessment by noting claimant sought treatment only sporadically and voiced no complaints during

relevant time period); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (absence in record of objective factors indicating existence of alleged limitations justifies conclusions of ALJ). Accordingly, the undersigned concludes the ALJ's decision was not contrary to the substantial evidence.

Crumb further contends the hypothetical posed by the ALJ to the vocational expert did not accurately reflect his limitations.[3]  He argues the ALJ failed to include his limitations on prolonged sitting as identified by Karvelas and Blair, and did not accommodate his difficulty concentrating. This argument is simply a restatement of Crumb's earlier arguments concerning the ALJ's alleged failure to properly consider his limitations which the undersigned has already rejected.

Crumb also argues the jobs identified do not exist in significant numbers in the economy. In concluding a claimant can perform jobs existing in significant number in the economy, the ALJ may rely on the testimony of a vocational expert in response to a hypothetical based on the evidence in the record.  *See Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000) (ALJ may rely on testimony of vocational expert as to whether applicant can perform identified jobs); *Morris v. Bowen*, 864 F.2d 333, 335-36 (5th Cir. 1988) (burden to show existence of employment for applicant is met by pointing to testimony of vocational expert at hearing).  *See also Dominguez v. Astrue*, 286 F. App'x 182, 188 (5th Cir. 2008) (ALJ did not err in relying on vocational expert testimony to demonstrate existence of significant number of jobs in national economy he could perform).  Accordingly, Crumb has not shown he is entitled to relief on this basis.

---

[3]In making this argument, Plaintiff also contends the vocational expert's suggestion of rest room attendant as an appropriate job failed to properly consider the limitation the ALJ included in her hypothetical of dealing with things, rather than people.  As the Commissioner notes, the vocational expert identified two other jobs which do fall within that limitation.  Thus, any error on this basis was not fatal.

Crumb next maintains the ALJ's credibility determination is not supported by substantial evidence. He contends the ALJ erroneously evaluated his activities of daily living. Specifically, Crumb points to the ALJ's finding that he was able to perform his personal grooming/hygiene, help out his wife with household chores, cook, clean and do laundry. According to Crumb, he is actually able to only cook frozen dinners, is slower at performing his personal grooming needs if he is in pain and needs to be reminded to take out the garbage or do his laundry.

Crumb has failed to show any error on this point. Notably, the evidence he cites in support of his limitations is the report completed by his wife. (Tr. 140). As the ALJ points out, during a June 2007 comprehensive psychiatric consultative examination, Crumb stated he was capable of performing his personal grooming and hygiene and that he did all the household chores of cooking, cleaning, and doing the laundry. (Tr. 368-70). Crumb repeated this in a June 2008 comprehensive psychiatric consultative examination. (Tr. 446-49). In his own disability report, Crumb states he is able to perform his own personal care, although somewhat slowly due to pain, is able to cook only simple dinners because he does not know how to cook, do laundry, take out the trash, walk, drive to the store and shop. (Tr. 145-49). The undersigned finds the ALJ's assessment of Crumb's activities of daily living is supported by substantial evidence.[4] *See Newton*, 209 F.3d at 459 (ALJ's credibility determinations entitled to great deference).

Finally, Crumb asserts the ALJ misstated the issue regarding "total disability." Although somewhat unclear, it appears he is arguing the ALJ incorrectly applied a standard under which Crumb was required to show he was unable to perform all work to be found disabled. The record

---

[4]Crumb also reports he sometimes needs reminders from his wife to perform household tasks. The undersigned notes the need for reminders to be simply a fact of life in many marriages, not evidence of disability.

clearly belies this contention.  The ALJ found Crumb to suffer from impairments which prevented him from performing his past relevant work, but that Crumb still retained the ability to engage in a restricted range of light work.  As noted above, the ALJ obtained testimony from the vocational expert specifically identifying jobs Crumb was able to perform.  Accordingly, Crumb has failed to show error on this basis.

## VI.  RECOMMENDATION

There is substantial evidence in the record that Crumb is capable of making a successful adjustment to other work existing in significant numbers in the national economy.  The ALJ relied on all the relevant medical evidence and had more than sufficient information to make an accurate residual functional determination.  Therefore, based on the evidence before the ALJ as stated in this report, and the findings articulated in the ALJ's decision, the undersigned **RECOMMENDS** that the District Court find the ALJ applied the proper standards and based the decision on substantial evidence, and **DENY** the claims made in the complaint.

## VII.  OBJECTIONS

The parties may file objections to this Report and Recommendation.   A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from

appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 24th day of May, 2012.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE